**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**DAVID R. YURUS,**

      **Plaintiff,**

**vs.**                                        **Case No. 4:01cv17-MCR/WCS**

**VARIABLE ANNUITY LIFE
INSURANCE COMPANY, d/b/a
AMERICAN GENERAL
FINANCIAL GROUP, et al.,**

      **Defendants.**

_____/


## REPORT AND RECOMMENDATION

District Judge Rodgers has referred to me "all pending motions which are related to the issues of fees and sanctions." Doc. 1015. Remaining for decision are motions filed by BenefitsCorp, Inc., and T. Rowe Price. Summary judgment was granted in favor of all Defendants, doc. 920, and that judgment has been affirmed as to Defendant T. Rowe Price. Doc. 1011 (mandate).

**BenefitsCorp, Inc.**

Pending are BenefitsCorp's motions for entitlement to attorneys' fees and sanctions. Docs. 934 (fees) and 936 (sanctions) and BenefitsCorp's motion to renew

these motions (docs. 934 and 936).  Doc. 1003.  Plaintiff filed unredacted documents

relating to the alleged settlement, doc. 1004, and an amended response, doc. 1013.[1]

Document 1013 ends with a request that the Court order that the settlement be

enforced.  "An application to the court for an order shall be by motion . . . ."

Fed.R.Civ.P. 7(a).  Therefore, the response will, in part, be deemed to be a motion.

BenefitsCorp filed a reply.  Doc. 1018.

**The settlement**

Plaintiff asserts in the amended response that he and BenefitsCorp settled these

issues, and that, as a consequence, the motion should be denied as moot.  Doc. 1013.

While a settlement would moot the motion, BenefitsCorp denies that there is a

settlement.

On October 26, 2004, counsel for BenefitsCorp wrote the following to counsel for

Plaintiff:

> This confirms our conversation today in which we agreed to settle the
> pending attorneys' fees and Rule 11 motions.  BenefitsCorp will not seek
> attorneys' fees against either your firm or your client nor will it move for
> costs.  In return, you client agrees to completely waive all possible
> appeals of the order granting BenefitsCorp's Motion for Summary
> Judgment and agrees to pay BenefitsCorp [$8,000[2]] for its costs.
>
> This Firm will prepare the settlement and mutual release papers and
> provide them to you as soon as possible.

Doc. 1003, exhibit 1; doc. 1018, composite exhibit A.  Plaintiff sent a letter in reply the

same day, stating:

---

[1] This response was initially filed as motion to enforce the settlement.  Doc. 1012.

[2] The dollar amount was redacted, but Plaintiff has shown that the amount
offered was $8,000.

> This will confirm our agreement that our client, David Yurus, has accepted
> your demand to settle this matter in the amount of $8,000 in exchange for
> a Mutual Release & Confidentiality Agreement.  Mr. Yurus will not be
> pursuing an appeal against your client and your pending Motions for Fees
> and Costs and Rule 11 Sanctions will both be withdrawn.

Doc. 1004, exhibit 1; doc. 1018, composite exhibit A.

The parties then tried to work out the details of the "mutual release and confidentiality agreement."  On November 3, 2004, Plaintiff asked BenefitsCorp to send the Settlement Agreement for review.  Doc. 1018, composite exhibit A.  On November 15, 2004, Plaintiff sent an email to Defendant asking for a "similar release."  *Id.*  On November 18, 2004, Defendant sent Plaintiff the new draft of the settlement agreement, adding former Plaintiff Samantha Yurus and asking that both be executed.  *Id.*  Plaintiff emailed Defendant on December 7, 2004, stating:  "Will express deliver tonight and send executed copies with check as soon as received."  *Id.*

Defendant responded with a letter on December 8, 2004, urging closure with Plaintiff.  *Id.*  On December 9, 2004, counsel for Plaintiff wrote:

> As I indicated, we have distributed the Settlement Agreement and Release
> to David Yurus for his signature.  I will forward it as soon as we receive it
> in return.  In the meantime, please note the enclosed check in the amount
> of [$8,000] and 00/100 as agreed.

*Id.*

On March 3, 2005, Defendant asked about the status of the executed settlement agreement.  *Id.*  On March 15, 2005, counsel for Plaintiff wrote to advise that David Yurus "will not execute the Settlement Agreement and General Release."  *Id.*  The letter noted that the $8,000 check had been sent to BenefitsCorp and Plaintiff's appeal as to BenefitsCorp had been dismissed with prejudice, and asked whether Defendant

intended to cash the check and dismiss all claims in this court.  *Id.*  On April 5, 2005, Defendant returned the check and said that it would pursue the pending motions for fees and sanctions unless Plaintiff would agree to sign the settlement agreement and release, and send a new check.  *Id.*  Plaintiff has not executed the settlement agreement, including the mutual releases.

Plaintiff argues that he has substantially performed the agreement.  The parties, however, never reached a meeting of the minds as to the specific terms of the mutual releases.  The mutual releases of liability were essential consideration to BenefitsCorp for this settlement.  Thus, the settlement cannot exist until the mutual releases are mutually agreed upon and mutually executed, or BenefitsCorp waives that requirement.

While counsel for Plaintiff represented that Plaintiff had agreed to settle, he did not represent that the specific terms of the mutual release had been agreed upon.  The only agreement was that a mutual release would be an essential element of the settlement.  When counsel tried to get David Yurus to sign the release, Yurus refused.

Plaintiff Yurus was not required to sign the release.  There is no evidence that counsel for Plaintiff had authority to agree to the specific terms of these releases for Plaintiff.  *See*, Walker v. Palm West Hosp., Inc., 819 So. 2d 904, 906 (Fla. 4th DCA 2002) ("there can be no settlement absent a 'clear and unequivocal' grant of authority from the party to his attorney to settle a cause of action on his behalf.").  Thus, the settlement could not have come into being without the signature of Plaintiff on the mutual releases.  Since agreement as to the specific terms of the mutual release never occurred, there is no settlement.  Cheverie v. Geisser, 783 So. 2d 1115, 1119 (Fla. 4th DCA), *review denied*, 805 So. 2d 806 (Fla. 2001) (table).

For these reasons, Plaintiff's motion to enforce the settlement, doc. 1013, should be denied.  The Court should adjudicate BenefitsCorp's motions for fees and sanctions.

### BenefitsCorp's motion for fees pursuant to 42 U.S.C. § 1988 (Doc. 934)

Plaintiff filed a response to the motion for § 1988 fees filed by T. Rowe Price, but it did not file a response to the merits of these motions by BenefitsCorp.  Instead, Plaintiff argued that the matter had been settled.  Plaintiff did file a response to a similar motion by T. Rowe Price.  Since the fee issues are the same, Plaintiff's response to the motion by T. Rowe Price will be considered here.

BenefitsCorp seeks attorneys fees pursuant to 42 U.S.C. § 1988(b).  Defendant asks the Court to determine liability first, following the procedure set forth in Local Rule 54.1(D).  This report and recommendation follows that procedure, addressing liability first.

A defendant who has been put to the cost of defending against claims that are without foundation are entitled to an award of attorney's fees:

> Under 42 U.S.C. § 1988, a prevailing defendant is entitled to recover attorney's fees if "the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."

Baker v. Alderman, 158 F.3d 516, 524-525 (11th Cir. 1998) (citations and footnotes omitted); Harrington v. Cleburne County Bd. of Educ., 251 F.3d 935, 939 (11th Cir. 2001) ("A defendant who has prevailed has not 'prevailed' unless the plaintiff's action was 'frivolous, unreasonable, or without foundation.'  Sayers v. Stewart Sleep Ctr., Inc., 140 F.3d 1351, 1353 (11th Cir.1998) (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)).").

In determining whether a suit is frivolous, "a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Jones v. Texas Tech University*, 656 F.2d 1137, 1145 (5th Cir.1981). Cases where findings of "frivolity" have been sustained typically have been decided in the defendant's favor on a motion for summary judgment or a Fed.R.Civ.P. 41(b) motion for involuntary dismissal. *In these cases, the plaintiffs did not introduce any evidence to support their claims.* . . .

Factors considered important in determining whether a claim is frivolous also include: (1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits.

<u>Sullivan v. School Bd. of Pinellas County</u>, 773 F.2d 1182, 1189 (11th Cir. 1985)

(citations omitted, emphasis added).

In granting summary judgment to BenefitsCorp, District Judge Rodgers wrote:

As an initial matter, the Court unequivocally – and without further discussion – rejects Yurus' strained and unsubstantiated assertions of a massive conspiracy and coverup orchestrated by the Providers and others to defraud DCP participants and the State of Florida. Upon review of the record, the Court finds that such allegations are *wholly lacking in credible evidentiary support and that any inference of conspiracy is implausible*. <u>See</u> <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 592-94. The Court has no doubt that, whether by direct or circumstantial evidence, *Yurus has failed entirely to support these farfetched, if not irrational and perhaps even scurrilous, allegations*.

Doc. 920, p. 5 (emphasis added). The Court found *no* evidence to support any of

Plaintiff's claims:

In short, there is no direct evidence or any reasonable inference that can be drawn of any agreement between BenefitsCorp and any other Provider or State actor regarding Yurus' discharge from his job, involuntary commitment, or arrest.

*Id.*, p. 7.  The Court further said that the failure to establish any agreement, an essential

element of a *prima facie* case of conspiracy, made consideration of the remaining

elements unnecessary.  *Id.*, p. 5, n. 5.

With specific reference to BenefitsCorp, the Court found:

As to BenefitsCorp, its regional vice-president Muriel Knapp testified that
she did not discuss Yurus' job performance with Kandi Hicks Winters
(Financial Administrator of the DCO [Deferred Compensation Office] and
Yurus' supervisor) or others; that she was unaware that the DCO was
contemplating terminating Yurus' employment until after the fact; and that
she was not privy to internal DOI documents or discussions regarding
concerns about Yurus or his dismissal.  Additionally, Ms. Winters testified
that even if Ms. Knapp had been aware that Yurus' employment might be
terminated, Ms. Knapp would have had no part in actually making the
decision because such matters were reserved to the DCO and Ms.
Winters herself. Moreover, Ms. Knapp testified that she did not know
Phillip Payne, the attorney who executed the affidavit which led to Yurus'
involuntary commitment for psychiatric evaluation. Nor did she know
Officer Glenn Edrington of the Florida Capitol Police, who sought an order
for Yurus' temporary commitment based upon that affidavit and who also
later executed the probable cause affidavit for Yurus' arrest. Ms. Knapp
also stated that she did not know any of the staff at the Apalachee Center
where Yurus was committed, did not enter into any agreement to have
Yurus committed or arrested, and was not even aware that such actions
were under consideration.  Further, it is undisputed that it was none other
than the Apalachee Center staff who alone determined the need for
holding Yurus for the full seventy-two hour evaluation period rather than
immediately releasing him, as provided by law.  Finally, although at the
February 17, 2000, Investment Provider Meeting Yurus' name came up in
a bantering, even derogatory manner, there is no indication that there was
any real discussion, much less any agreement, regarding his commitment
and arrest; moreover, the meeting took place many months *after* Yurus
was discharged from his position.  In short, there is no direct evidence or
any reasonable inference that can be drawn of any agreement between
BenefitsCorp and any other Provider or State actor regarding Yurus'
discharge from his job, involuntary commitment, or arrest.

*Id.*, p. 9 (footnotes omitted).

The Court also found that:

> . . . the documentary evidence cited by Yurus contains nothing which supports, either directly or by reasonable inference, that the Providers agreed among themselves or with others to discharge Yurus or to have him committed or arrested.

*Id.*, p. 10.  The Court said that the evidence was " most accurately – highly speculative," and "rather than an inference of conspiracy it may be said that the evidence at best supports the unfounded conjecture that certain improprieties could have transpired." *Id.*, p. 11.

In sum, the District Judge was unable to find any evidence supportive of Plaintiff's claims.  Doc. 920.  This should be dispositive of the § 1988 fees motion.  The matter, however, has been referred to me for a recommendation as to this § 1988 fees motion.  I have reviewed a number of filings in the record to see if I can now find any evidence presented by Plaintiff that would make an award of § 1988 attorney's fees inappropriate.

In response to the motion for sanctions filed by T. Rowe Price, Plaintiff quoted from the allegations of the complaint, reiterated "core arguments," and "undisputed facts."  Doc. 965, pp. 7, 8-10, 17-19.  There is no citation therein to *evidence* to support the allegedly "undisputed facts," and none of the alleged undisputed facts relates to the culpability of BenefitsCorp.

I have also read Plaintiff's statement of facts filed in support of his motion for partial summary judgment as to a conspiracy to violate his First Amendment Rights.  Doc. 738.  The alleged undisputed facts to establish a conspiracy are contained in paragraphs 24 through 91 of document 738.  The only paragraphs having direct

reference to BenefitsCorp are paragraphs 62, 67, and 68.  These refer to Muriel Knapp, the representative of BenefitsCorp (a subsidiary of Great West).

Paragraph 62 refers to exhibit 36, pages 105 to 107 of the deposition of Muriel Knapp.  That exhibit is found among the exhibits filed as part 15 attached to document 738 on the electronic docket.[3]  Muriel Knapp testified that she did not have conversations with "her"[4] about "his"[5] job performance.  Doc. 738, part 15, p. 39, deposition p. 106.  She said she had "conversations with her regarding him calling my staff and putting them in a very uncomfortable position.  That was it."  *Id.*  She said she did not talk with any other Providers before David Yurus was terminated.  *Id.*  She denied that Winters called her or sent her an email to tell her that Yurus called T. Rowe Price to say he was "going" to the Wall Street Journal, presumably to make a report of wrongdoing to that newspaper.  *Id.*, deposition p. 107.

In paragraph 67, Plaintiff asserts that Muriel Knapp asked Hicks-Winters to include two mutual funds in the Plan which failed to meet State Board of Administration (SBA) policy, though Knapp knew of the SBA policy.  Cited for this is exhibit 44, which is

---

[3] These exhibits were filed on December 1, 2003, just two weeks after this Court converted to electronic filing.  The exhibits were scanned by the Clerk into the electronic docket.  To make the scanning process work, the documents were broken into groups of about 40 pages. Though the groups were in sequence by pages, discrete exhibits were no longer identified.  Thus, when document 938 is retrieved electronically, 18 "parts" are shown.  The first is the "main document," and parts 2-18 are the exhibits. Each "part" contains pages of the exhibits in numerical sequence as filed, but fails to number the exhibits using the numbers as filed.  In this report and recommendation, I have identified the "part" and then the page number of the "part" where the exhibit begins.

[4] Ms. Hicks-Winters, Administrator of the Florida Deferred Compensation Office.

[5] David Yurus, Plaintiff.

found among the exhibits filed as part 16, pp. 28-29, attached to document 738 on the electronic docket.  There is no evidence in exhibit 44 to support this assertion of fact.  In paragraph 67, Plaintiff also asserts that on August 31, 1999, Yurus wrote a memo to Hicks-Winters "indicating that such funds should not be included and providing a rationale."  *Id.*  This memo (exhibit 44) lists two funds which were on probation status according to Morningstar criteria, but not on termination status.  Yurus makes no recommendation in this memo to anyone to "not include" these funds.[6]

In paragraph 68, Plaintiff states that between September 7, 1999, and September 14, 1999, he wrote additional memos to Hicks-Winters "*questioning why she had told Muriel Knapp* that funds not in conformance with the SBA policy offered by Great West had been 'approved' for inclusion in the program."  (Emphasis added.)  He asserted that he again advised her that such funds should not be included based upon SBA policy.  Cited for this is exhibit 45, DOI 00171 and DOI 02042, which is found among the exhibits filed as part 16 attached to document 738 on the electronic docket. I have read the two memos which comprise exhibit 45, and there is nothing in them to support the factual assertions of paragraph 68.

Plaintiff also filed an opposition to summary judgment filed by BenefitsCorp and a statement of facts.  Doc. 778.  Plaintiff relied in part upon the evidence he had filed in support of his motion for partial summary judgment.  *Id.*, n. 2.  Plaintiff also relied upon evidence submitted by BenefitsCorp.  *Id.*

---

[6] It may be assumed that somewhere in this vast record there is evidence that Plaintiff recommended that certain funds be terminated, since that allegation is central to this case, but the evidence in this instance (like many others) is not at the place cited.

Document 778 is a much more detailed statement of the evidence that Plaintiff presented to support his claims. The document, however, is an unfocused presentation. While Plaintiff from time to time cites some exhibit in the record as evidence supportive of a factual contention, the Court's ability to discern a genuine dispute of material fact is seriously clouded by long stretches of argument rather than evidence. As a response to a motion for summary judgment, the document was supposed to be "a separate, short and concise statement of the material facts *as to which it is contended that there exists a genuine issue to be tried* . . . ," and it was supposed to "reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source." N.D. Loc. R. 56.1(A). Counsel was so advised in the initial scheduling order. Doc. 22, ¶ 10. Document 778 only occasionally provides a citation to the record to support a specific assertion of fact and thus significantly fails to identify the evidence creating a genuine dispute of material fact for trial.[7]

Plaintiff stated that he wrote to Hicks Winters on May 25, 1999, noting that three funds provided by Great West mutual funds (BenefitsCorp) had a "termination" rating by Morningstar. *Id.*, ¶ 1. This assertion of fact is supported by evidence, an exhibit. *Id.*, exhibit 27 (page 32 of part 14 attached to doc. 738). Plaintiff asserted that no funds offered by Great West (BenefitsCorp) were ever terminated. *Id.*, ¶ 1. Plaintiff asserted

---

[7] The Local Rule and the Scheduling Order warned: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be filed and served by the opposing party." That is why the District Judge refused to consider any assertions of fact made by Plaintiff unconnected with a precise record citation.

that BenefitsCorp performed a review and noted four funds as candidates for termination, but BenefitsCorp failed to advise Plan participants.  *Id.*, ¶ 2.  Plaintiff asserted that Muriel Knapp, manager for Great West, asked Hicks Winters to include two mutual funds in the Plan which failed to meet SBA policy, *id.*, ¶ 3, a statement which seems inconsistent with the assertion that BenefitsCorp itself marked four funds for termination.

Plaintiff again asserted that he wrote memos "questioning why [Hicks Winters] had told Muriel Knapp that funds not in conformance with the SBA policy offered by Great West had been 'approved' for inclusion in the program."  *Id.*, ¶ 3.  Cited for this is exhibit 45, discussed above, which does not contain evidence to support this assertion of fact.

In paragraph 8, Plaintiff asserted that Hicks Winters improperly accepted gifts from "Providers."  This general accusation is not specifically tied to a particular gift from BenefitsCorp or to Muriel Knapp.  There is an assertion that Muriel Knapp was a "wedding attendee" without any cite to evidence in the record.

Plaintiff argued that the conspiracy is evidenced by the fact that state managers decided not to disclose SBA policy to the participants.  *Id.*, ¶¶ 9 and 10.  The discussion of this concedes that the "pros and cons" of such disclosure were discussed, and it was "collectively decided that it [disclosure] was not a good idea."  *Id.*, ¶ 9, citing deposition excerpts of Hugh Buerke.  It would have been helpful had Plaintiff set forth those "pros and cons" to show that there was no legitimate reason not to disclose.  As it stands, the evidence is not supportive of the conspiracy theory because the reasons not to disclose might have been in favor of protecting the value of the investments of investors.

Perhaps the most telling example of the lack of evidence of a conspiracy as to BenefitsCorp arises on page 27 of Plaintiff's "Statement of Material Facts." Doc. 778. There, Plaintiff notes that BenefitsCorp has stated in paragraph 42 of its Statement of Facts (in support of BenefitsCorp's motion for summary judgment), that in his deposition, Plaintiff David Yurus testified that the sole evidence of a conspiracy between BenefitsCorp and the State to terminate him was the decision not to terminate the three funds discussed at the May 25, 1999, meeting. Doc. 778, p. 27. To support BenefitsCorp's contention that this was an undisputed fact, BenefitsCorp provided an excerpt from Plaintiff's deposition. In that excerpt, Plaintiff said that his "specific evidence" that "Great-West [BenefitsCorp] joined or participated in a conspiracy to terminate [his] employment" was that "[t]hey didn't eliminate those funds, to my knowledge." *Id.*

Plaintiff followed this assertion of undisputed fact with the word: "false." *Id.* He argued that "symbiosis" and "entwinement" proved a conspiracy, and that Hicks Winters "called each of the Provider Defendants and has admitted to doing so over a period of a 'month or two.' " *Id.* Relative to the claim against BenefitsCorp, Plaintiff cited to pages 105-107 of the deposition of Muriel Knapp. *Id.*, p. 28. He referred to paragraph 62 of his own statement of facts in support of partial summary judgment, doc. 738, for the proposition that "Hicks-Winters calls or meets with all Providers *to discuss the termination of Yurus.*" *Id.* (emphasis added). This is inaccurate, as discussed above. Ms. Knapp did not so testify. She only reported that Plaintiff had been calling her employees and putting them in an "uncomfortable" position.

Nor did Ms. Hicks Winters so testify.  Hicks Winters only discussed how Plaintiff was allegedly treating Provider staff.  In paragraph 62, doc. 738, and page 28, doc. 778, Plaintiff cites the deposition of Ms. Hicks Winters, pages 193-194, and 213-215, as evidence that she had called "all Providers to discuss the termination of Yurus."  This is found as part 9 attachment to doc. 738, exhibit 9, pp. 28-31.  Hicks Winters testified that at the time that it was decided to terminate Plaintiff's employment, she had "already" spoken with "Great West."  *Id.*, deposition p. 193.  She said that she spoke with Muriel Knapp on a daily basis.  *Id.*  She said that Knapp was "very concerned" because Plaintiff "had called her office on numerous occasions and had been very belligerent and ugly to her staff demanding that they get her out of a meeting . . . ."  *Id.*, pp. 193-194.  She testified:  "He would call them two days in advance before [the quarterly returns were] even due and start yelling at them.  And saying, get her out – and threatening the, it was just horrible."  *Id.*, p. 194.  Hicks Winters said that Knapp had called her to report this behavior.  *Id.*  She denied that Knapp recommended that she "get rid of him."  *Id.*  She admitted that she and several of the Providers talked about how Plaintiff was treating their staff.  *Id.*, p. 214.

With respect to production of evidence that Knapp had anything to do with Plaintiff's arrest and civil commitment, Plaintiff simply argued that even if Knapp knew nothing about this, she could be liable because she otherwise had joined the conspiracy to harm Plaintiff.  Doc. 778, p. 29.  He also said in his deposition that he believed Knapp was involved because she and Hicks Winters were "best friends,"[8] she went to the

---

[8] BenefitsCorp denied that Knapp and Hicks Winters were best friends.  Doc. 778, p. 31, quoting paragraph 69, BenefitsCorp's Statement of Facts, n. 8.

wedding of Hicks Winters, they "spent, you know, big bucks on . . . luncheons," and BenefitsCorp "guys" participated in a February meeting (several months later) in which derogatory comments about Plaintiff were made.

In summary, I cannot find any evidence identified by Plaintiff to prove an agreement between BenefitsCorp and state actors to unlawfully harm Plaintiff.  That three or four investments provided by Benefits Corp should have been terminated and were not, in contravention of Plaintiff's recommendation, and the fact that Muriel Knapp asserted to Hicks Winters that Plaintiff had been behaving improperly to her staff, is not evidence that BenefitsCorp conspired to have Plaintiff terminated, arrested, and civilly committed for mental health treatment, and it was frivolous of Plaintiff to have so contended.

All of the criteria for an award of fees are present in this case.  Plaintiff produced no evidence to support his claims against BenefitsCorp.  Defendant offered $5,000 to settle on August 23, 2003.  Doc. 934, attachment 1.  The case ended before trial.  Thus, the motion filed by BenefitsCorp for attorney's fees, doc. 934, should be granted. Plaintiff David Yurus should be found to be liable for attorney's fees, and the parties should be directed to comply with N.D. Fla. R. 54.1(E).

### BenefitsCorp's Motion for Sanctions pursuant to Rule 11 and 28 U.S.C. § 1927, doc. 936

BenefitsCorp's motion for Rule 11 and 28 U.S.C. § 1927 sanctions, doc. 936, is also pending.  BenefitsCorp seeks fees and expenses against Plaintiff Yurus and counsel, Steven R. Andrews, for filing and litigating Plaintiff's motion for partial summary

judgment.  Doc. 737.  Plaintiff's motion for partial summary judgment was filed on

December 1, 2003.

Fed.R.Civ.P. 11(b) provides:

By presenting to the court (whether by signing, filing, submitting, or later
advocating) a pleading, written motion, or other paper, an attorney or
unrepresented party is certifying that to the best of the person's
knowledge, information, and belief, formed after an inquiry reasonable
under the circumstances, –

\*                    \*                    \*

(2)  the claims, defenses, and other legal contentions therein are
warranted by existing law or by a nonfrivolous argument for the extension,
modification, or reversal of existing law or the establishment of new law;

(3)  the allegations and other factual contentions have evidentiary
support or, if specifically so identified, are likely to have evidentiary
support after a reasonable opportunity for further investigation or
discovery; . . .

Fed. R. Civ. P. 11(b).

The focus is upon what is known or should have been known at the time of filing

the document:

Rule 11 sanctions are proper "(1) when a party files a pleading that has no
reasonable factual basis; (2) when the party files a pleading that is based
on a legal theory that has no reasonable chance of success and that
cannot be advanced as a reasonable argument to change existing law;
and (3) when the party files a pleading in bad faith for an improper
purpose."  The text of Rule 11 permits sanctions only if the objectionable
court paper is "signed in violation of this rule."  *Accordingly, the court's
inquiry focuses only on the merits of the pleading gleaned from facts and
law known or available to the attorney at the time of filing.* "The court is
expected to avoid using the wisdom of hindsight and should test the
signer's conduct by inquiring what was reasonable to believe at the time
the pleading, motion, or other paper was submitted."

In this circuit, a court confronted with a motion for Rule 11 sanctions first
determines whether the party's claims are objectively frivolous – in view of
the facts or law – and then, if they are, whether the person who signed the

pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry.  If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound.  *The reasonableness of the prefiling inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the underlying facts; and whether the paper was based on a plausible view of the law.  The reasonableness of the inquiry may also depend on the extent to which factual development requires discovery.*

Jones v. International Riding Helmets, Ltd., 49 F.3d 692, 694-695 (11th 1995) (citations omitted, emphasis added).

Thus, unlike § 1988, Rule 11 does not, strictly speaking, depend upon how the evidence ultimately turns out.  Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Associated Contractors, Inc., 877 F.2d 938, 942 (11th Cir. 1989), *cert. denied*, 493 U.S. 1079 (1990) (Rule 11 does not impose a continuing duty to amend the complaint).  However, if subsequent events make it no longer reasonable to prosecute a claim, it would be a violation of Rule 11 to continue to argue the claim by filing opposition to a case dispositive motion.  *Id*.

Rule 11 is not "intended to chill innovative theories and vigorous advocacy that bring about vital and positive changes in the law."  Davis v. Carl, 906 F.2d 533, 538 (11th Cir. 1990).  "As we see it, Rule 11 is intended to deter claims with no factual or legal basis at all; creative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment."  *Id*.  "Although sanctions are warranted when the claimant exhibits a 'deliberate indifference to obvious facts,' they are not warranted when the claimant's evidence is merely weak but appears sufficient, after a

reasonable inquiry, to support a claim under existing law."  Baker v. Alderman, 158 F.3d at 524.

### Groundless legal theories

BenefitsCorp first argues that Rule 11 sanctions are appropriate because Plaintiff David Yurus alleged new, baseless legal theories when he filed his motion for partial summary judgment.  In part BenefitsCorp complains of the assertion that all private Defendants were liable for the actions of state actors, even though they did not know of those specific actions.  Plaintiff argued that this vicarious liability was available because of the "symbiotic" relationship that the Providers had with the state actors.  BenefitsCorp argues that Plaintiff has interposed this meritless legal theory to make up for the lack of evidence of a § 1983 conspiracy.

This argument concerning a "symbiotic relationship" appears in the motion for partial summary judgment, and begins with a citation to Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).  Doc. 737, p. 10.  The claim in Dennis v. Sparks was that private persons had bribed a state judge.  449 U.S. at 27, 101 S.Ct. at 186. Bribing a state judge is an act evidencing an agreement among the private defendants and the state judge to harm the Plaintiff in a specific way.  The specific harm is the object of the conspiracy.  But Plaintiff, to his credit, correctly set forth the ruling in that case in his motion, noting that it was a bribery case.  Doc. 737, p. 10.

Plaintiff also argued that BenefitsCorp and other Providers were "joint employers" and liable under this theory of joint action.  Doc. 737, p. 6, n. 3.  Cited for this was Virgo v. Riviera Beach Associates, Ltd., 30 F.3d 1350, 1359 (11th Cir. 1994).  In that case, the court said:

The district court held that Riviera Beach and Sterling Group jointly employed all of the employees working at the Sheraton Ocean Inn. In reaching this decision, the district court focused on the test stated in *National Labor Relations Board v. Browning-Ferris Industries*, 691 F.2d 1117 (3d Cir.1982):

> The basis of the finding is simply that *one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.* Thus the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

Id. at 1122 (citation omitted).

30 F.3d at 1359 (footnote omitted, emphasis added). Virgo was a Title VII case concerning who was the employer, and had nothing to do with proof of a § 1983 conspiracy.

Plaintiff also cited Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) as authority for this particular theory of symbiosis. Doc. 737, p. 13. This was the first accurate cite to this theory of state action. That case was a landmark in finding state action when a municipality and a private lessee in a building financed with public funds had become so entangled and interdependent in the operation of these businesses that the action of the private lessee could be said to be fairly attributable to the state.

Plaintiff's use of Burton here is misplaced. As Judge Vinson explained in granting the motion to dismiss the second amended complaint, the "symbiotic relationship" concept of state action is used to "charge a private party with state action through such joint action [with a state actor]." Doc. 268, p. 9. But "[t]his symbiotic

relationship must involve the 'specific conduct of which the plaintiff complains.' " *Id.*, quoting Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1348 (11th Cir. 2001) (quoting American Mfrs. Mut. Ins. Co. V. Sullivan, 526 U.S. 40, 51, 119 S.Ct. 977, 143 L.Ed.2d 130, 144 (1999)).[9]

The Rayburn case was decided over two years before Plaintiff filed his motion for partial summary judgment, and Plaintiff was reminded of the proper standard by Judge Vinson before he filed his motion for partial summary judgment.  Rayburn noted that one of the three ways that a private party may be liable as a state actor is if "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[]" ("nexus/joint action test")."  241 F.3d at 1347, quoting, NBC, Inc. v. Communications Workers of America, 860 F.2d 1022, 1026-27 (11th Cir. 1988).  "To charge a private party with [S]tate action under this standard, the governmental body and private party must be intertwined in a 'symbiotic relationship.' "  *Id.*, quoting, NBC, 860 F.2d at 1027.

However, as quoted by Judge Vinson above, the Court further said that the Supreme Court had ruled that the symbiotic relationship must involve the specific conduct of which the plaintiff complains.  *Id.*, at 1348, quoting American Mfrs. Mut. Ins. Co. V. Sullivan, quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).  In Rayburn, the State of Georgia regulated foster parents and

---

[9] Thus, the law concerning civil liability for the acts of co-conspirators is more restrictive than the law governing criminal liability.  Criminal conspirators are criminally liable for foreseeable actions by coconspirators in furtherance of the conspiracy. United States v. Nixon, 918 F.2d 895, 907 (11th Cir. 1987), *citing,* United States v. Walton, 908 F.2d 1289, 1300 (6th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990) (*citing* Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)).

extended tort immunity to foster parents, but there was no evidence that the State had become involved in the "specific conduct of which the plaintiff complains," child abuse. *Id.*

Plaintiff was on notice that this was the law when Judge Vinson's order was entered, and should have known of Rayburn, American Mfrs., and especially Blum v. Yaretsky, decided in 1982.  There is no such thing as vicarious liability in a § 1983 civil conspiracy.  Plaintiff did not correctly identify the law and then make a plausible argument for a change of law.  Thus, it was frivolous to argue that there was a broader conspiracy to refuse to disclose poorly performing funds to investors, and that BenefitsCorp could be vicariously liable as a co-conspirator in this larger conspiracy for acts in furtherance of the conspiracy as to which BenefitsCorp had no part.  The relevant symbiotic relationship had to involve an agreement by BenefitsCorp with state actors to have Plaintiff fired from his job, civilly committed, and arrested.  BenefitsCorp is right that this, as a matter of law, was a frivolous attempt to avoid the problem of a lack of evidence to support the claim of a § 1983 conspiracy.

Consequently, Rule 11 sanctions are warranted against both Plaintiff and his attorney, Steven R. Andrews, for filing the motion for partial summary judgment and then persisting in the litigation of that motion.  Thus, there is no need to address the related claim that it was a violation of Rule 11 to argue that BenefitsCorp was vicariously liable because it had conspired with the state actors to violate the security laws,[10] nor is there a need to address the § 1927 claim.

---

[10] It should be noted, however, that the Eleventh Circuit ruled with respect to the T. Rowe Price appeal that it would not entertain an attempt to "recast his § 1983 action as one involving violations of both the federal securities and state fiduciary laws."  Doc.

### Lack of evidence

BenefitsCorp also contends that Plaintiff moved for partial summary judgment without any evidence to support his claim in ground one.  The centerpiece of this argument is the February 17, 2000, meeting with Providers and state employees.  In the Third Amended Complaint filed on October 21, 2002, Plaintiff alleged that "at this [February 17, 2000,] meeting it was agreed among the Defendants that Defendant Winters and Cain should continue to discredit and silence Mr. Yurus.  Within approximately 30 days of this meeting of the Providers, Mr. Yurus was arrested as the result of events which occurred on October 15, 1999[,] and involuntarily committed." Doc. 281, ¶ 31.  Plaintiff also alleged that:

> At this February 17, 2000[,] meeting, the Provider Defendants jointly with Defendants Winters and Cain agreed to engage in a conspiracy to silence Yurus . . . .  It was agreed by the Providers that Defendant Winters would continue her efforts to attempt to discredit Yurus by engaging in efforts to have Mr. Yurus arrested or otherwise detained or discredited.

*Id.*, ¶ 61.

District Judge Vinson relied heavily upon this allegation in the order denying the motion to dismiss the Third Amended Complaint.  Doc. 400, p. 7.  The Court found that unlike the Second Amended Complaint, this complaint provided "sufficient detail."  *Id.*, p. 8.

BenefitsCorp now asserts, and Plaintiff has not disputed, that "prior to moving for summary judgment, Yurus obtained a recorded copy of the February 17, 2000 provider

---

1015.

meeting."  Doc. 936, p. 7.  In the order granting summary judgment, District Judge

Rodgers found that:

> Finally, although at the February 17, 2000, Investment Provider Meeting
> Yurus' came up in a bantering, even derogatory[] manner, there is no
> indication that there was any real discussion, much less any agreement,
> regarding his commitment and arrest; moreover, the meeting took place
> many months *after* Yurus was discharged from his position.

Doc. 920, p. 7.

According to the transcript, Plaintiff became the topic of discussion at the

February 17, 2000, meeting.  The conversation was casual.  Someone asked if "you

own any firearms."  Doc. 725, part 4, exhibit 20, p. 24 (transcript page 42) (hereafter the

transcript page numbers will be used).  There then was a discussion about whether

Plaintiff still lived in town, where he lived, some talk about seeing him jogging in the

afternoon, and someone mentioned the "Unabomber," a veiled derogatory reference to

Plaintiff.  *Id.*, pp. 43-44.  Someone said that Plaintiff had said that he will "drop this if you

just give me my job back."  *Id.*, p. 45.  Someone stated that "he was worse on Muriel

than anybody on your staff."  *Id.*  Two female speakers described Plaintiff's behavior as

"total abuse."  *Id.*  Someone stated that "he just [sic] demanding that he speak to me. . .

.  And he really abused them.  He totally abused them."  *Id.*, p. 47.  Another female

speaker stated that "the support has made me feel good."  *Id.*, p. 48.  Someone else

stated: "We did install locks on our doors."  *Id.*, p. 50.  The conversation then turned to a

discussion of an audit, proposed changes in investment policies, an appearance before

the Florida Legislature, and other matters unconnected with Plaintiff.  *Id.*, pp. 51-68.

Plaintiff is not mentioned again during this meeting.  In short, rather than showing that

the Providers at this meeting "agreed . . . that Defendant Winters and Cain should

continue to discredit and silence Mr. Yurus," the comments made at the meeting prove the contention of Defendants that Plaintiff was perceived as being abusive without justification in his contacts with Providers.

In summary, the central reason that Plaintiff avoided another dismissal of the complaint and subjected BenefitsCorp to further discovery and litigation were the allegations concerning the February 17, 2000, meeting.  By the time that the motion for partial summary judgment was filed, Plaintiff and his attorney knew that the transcript of this meeting would not support these allegations of conspiracy.  Nevertheless, they persisted with this motion.[11]  This is a second basis for imposition of Rule 11 sanctions.

For these reasons, the motion for Rule 11 sanctions filed by BenefitsCorp, doc. 936 should be granted.  Plaintiff and his attorney should be held liable for the expenses of BenefitsCorp in defending against Plaintiff's motion for partial summary judgment.

**T. Rowe Price**

Pending also is T. Rowe Price's consolidated motion to reconsider its two prior rule 11 motions (docs. 194 and 834) and for attorneys' fees, expert fees, and costs. Doc. 937.  Plaintiff filed a response.  Doc. 965.

T. Rowe Price has filed a motion to renew the initial motion (doc. 937) for attorneys' fees.  Doc. 991.  This latter motion is a suggestion to the Court that the earlier motion is now ripe for adjudication since the appeal is final.  The motion should be granted.

---

[11] BenefitsCorp also notes that while Plaintiff claimed that BenefitsCorp conspired with state actors to have him fired for exercising his right to freedom of speech, Plaintiff did not address the internal memorandum issued by Hicks Winters listing a number of legitimate reasons to terminate Plaintiff.  Doc. 936, p. 16.  This is true, and a glaring oversight that will be discussed more fully ahead.

**The motion for attorney's fees pursuant to 42 U.S.C. § 1988**

The findings of the Court in granting summary judgment as to an absence of

evidence to support the conspiracy claim against BenefitsCorp apply equally here to T.

Rowe Price.  Doc. 920 (order granting summary judgment).  Additionally, as to T. Rowe

Price, the Court found:

> Defendants Washington Mutual, Security First, and T. Rowe Price have
> also sufficiently demonstrated an absence of evidence to support Yurus'
> case, through the relevant evidence discussed above as well as through
> other evidence referenced in their respective motions. . . .  T. Rowe Price
> employees Kent Miller and Kenneth Fuller both averred that they had no
> discussions with Ms. Winters or any other person concerning terminating
> Yurus' employment, involuntarily confining him for a psychiatric evaluation,
> or arresting him.  (See doc. 729, Affidavits at Tabs 1 and 2; doc. 795, Dep.
> of Kenneth Fuller at 64).  Mr. Miller and Mr. Fuller also both indicated that
> they first learned about these actions after the events had occurred.  (Id.).
> Further, Mr. Miller also testified that he never reported to anyone that
> Yurus had threatened him or that Yurus told him he was a "dead man."
> (Doc. 795, Dep. of Kent Miller at 32-34, 112-13).

*Id.*, pp. 8-9 (footnote omitted).  The Court considered

> statements in the depositions of Dwayne Maddron, an employee of the
> Florida State Board of Administration; Herman H. Mollman, an employee
> of Nationwide Retirement Solutions; Ms. Winters; Mr. Loopman; John
> Smith, an auditor employed by the Florida Inspector General Office for the
> DOI; Ms. Knapp; Lou Moreno, an employee of Nationwide Retirement
> Solutions; Mr. Morrow; and Officer Edrington.  (Doc. 738, Exhs. 6; 7 at 38-
> 39; 9 at 193-94, 213-15; 17 at 276-84; 35 at 38-39, 86-89, 111-12, 121-23,
> 255-68; 36 at 105-07; 37 at 11-13; 38 at 34-40; and 56 at 39-47).

*Id.*, p. 9 (footnote omitted).  The Court found nothing in these depositions

> sufficient to raise a genuine issue of material fact as to whether the
> Providers reached an agreement among themselves or with others to
> participate in an unlawful act against him.  To the contrary, while the
> referenced testimony indicates that certain of the Providers'
> representatives or others may have spoken with Ms. Winters about Yurus'
> conduct or treatment of them or their staff prior to the termination of his
> employment, none of the testimony even remotely suggests any sort of
> meeting of the minds to discharge Yurus.  Similarly, the cited evidence

> does not suggest a meeting of the minds among the Providers or with others to effectuate Yurus' commitment or arrest; rather, what little testimony there is regarding these events indicates no direct involvement whatsoever by the Providers in the efforts to commit Yurus or arrest him.

*Id.*

I have reviewed Plaintiff's response to this motion, doc. 965, Plaintiff's motion for partial summary judgment and statement of facts, doc. 737, and Plaintiff's statement of facts filed opposition to the motion for summary judgment filed by T. Rowe Price, doc. 780.  Document 780 is the most important.  Like document 778, however, this document fails to comply with N.D. Loc. R. 56.1.

For example, paragraph 41 of T. Rowe Price's statement of undisputed fact gives the details of an October 11, 1999, memorandum by Hicks Winters to Herb Yohner documenting the reasons "for not retaining Mr. Yurus as a permanent Career Service employee."  Doc. 780, p. 26.  The memorandum gave ten specific job performance deficiencies.  *Id.*  Plaintiff presented no evidence in response to create a genuine dispute of material fact that Hicks Winters did not have good cause to terminate his employment.  *Id.*  He only argued that *another* reason was on the list and now omitted, that he said disrespectful things about Hicks Winters to Providers, and he argued that this omitted reason proves that the Providers were talking to Hicks Winters about his job performance.  No evidence is cited for this assertion of fact.  Moreover, that the Providers were talking with Hicks Winters about the way they thought that Plaintiff was treating their staff abusively is apparently true, as discussed above and as evidenced in the transcript of the February 17, 2000, meeting.  But this was not evidence supportive

of Plaintiff's conspiracy claim.  A state employee cannot expect to keep his job if he is personally abusive to persons doing business with the state.[12]

Similarly, paragraph 44 of T. Rowe Price's statement of undisputed facts asserts that its representatives, Kent Miller and Kenneth Fuller, had no discussions with Hicks Winters about terminating Plaintiff, never knew that Plaintiff's termination was being considered, and did not participate at all in that decision.  Doc. 780, p. 27.  In an attempt to show a dispute of material fact as to this, Plaintiff cited the depositions of everyone other than Miller and Fuller, admitting that Miller and Fuller denied having such contact with Hicks Winters.  *Id.*  As the Court found, there is nothing in those other depositions to prove that T. Rowe Price had an agreement with a state actor to terminate Plaintiff for his protected speech.  That other Providers talked with Hicks Winters about Plaintiff's asserted abusive behavior toward their employees does not create any permissible inference that T. Rowe Price had an agreement with Hicks Winters to terminate Plaintiff for the exercise of his right of free speech.[13]

---

[12] Also, the First Amendment does not protect an employee from employment sanctions for abusive, discourteous speech.

[13] For example, in part Plaintiff relies here upon the deposition of Fred Loopman. *Id.* (citing paragraph 62 of doc. 738, which cites the excerpts of the deposition of Loopman).  Loopman testified that Hicks Winters called him and asked "what I thought of David Yurus," and Loopman said that he told her that he did not have any problem with Plaintiff, but suggested to her that the time for dealing with a problem with an employee was during the employee's probationary period.  Doc. 738, part 12, exhibit 17, p. 14, deposition transcripts pp. 276-277.  He said that he thought that Hicks Winters called him because he had had ten years of experience working for the state.  This plainly is not evidence that Loopman had an agreement with Hicks Winters to terminate Plaintiff.  It is only routine feedback from someone doing business with the State of Florida.  Further, it is not evidence that Kent Miller, Kenneth Fuller, or T. Rowe Price had anything to do with Plaintiff's termination.

Like BenefitsCorp, in early October, 2003, T. Rowe Price offered to settle for a "nominal" amount.  Doc. 937, declaration of April Boyer, counsel for T. Rowe Price.  The settlement failed.  *Id.*  Settlement again was discussed at mediation and failed.  *Id.*

Thus, the motion of T. Rowe Price should be granted.  Pursuant to 42 U.S.C. § 1988, the Court should find that Plaintiff David Yurus liable for all of the costs incurred by T. Rowe Price in defense of this suit.

T. Rowe Price also seeks fees and costs against former Plaintiff Samantha Yurus.  In the Initial Complaint filed on January 11, 2002, Plaintiff Samantha Yurus brought a claim for loss of consortium.  Doc. 1, count eight.  The claim depended upon proof of the federal constitutional claims by David Yurus.  *Id.*  In the Second Amended Complaint, this claim became count eleven and it was brought for the first time against T. Rowe Price.  Doc. 121.  On June 5, 2002, T. Rowe Price moved in part to dismiss the Second Amended Complaint as to Samantha Yurus's claim of loss of consortium claim.  Doc. 161.  It was argued that the claims in counts one through ten were constitutional claims personal to David Yurus, and that his spouse, Samantha Yurus, had no claim for loss of consortium derivative from David Yurus's claims.  It was also argued that the loss of consortium claim depended upon the success of David Yurus's claims, and because David Yurus failed to state a claim, the loss of consortium claim necessarily failed.

Judge Vinson agreed with the second argument.  He dismissed the claim because he had dismissed David Yurus's claims, and "[a] claim of consortium cannot stand alone."  Doc. 268, p. 9.  Plaintiff dropped the consortium claim after that.

Since the consortium claim depended entirely on the merits of the claims brought by David Yurus, and since those claims had no evidentiary support, then there was no evidence to support the loss of consortium claim.  Samantha Yurus should be held liable for attorney's fees pursuant to 42 U.S.C. § 1988 to the extent that T. Rowe Price incurred such fees in defense of this claim.

**Rule 11**

T. Rowe Price seeks Rule 11 or § 1927 sanctions against David Yurus, Samantha Yurus, and counsel, Steven R. Andrews.  Doc. 937.  The motion asks that the Court *reconsider* two earlier Rule 11 motions.

Rule 11 is directed to the "filing" of a pleading.  There appear to be only three at issue:  the Second Amended Complaint, doc. 121, the Third Amended Complaint, doc. 281, and Plaintiff's motion for partial summary judgment, doc. 937.

The first Rule 11 motion, doc. 194, was necessarily directed to the Second Amended Complaint.  It was denied on January 29, 2003, but the denial was without prejudice "with leave to *refile* after the dispositive motions are ruled upon."  Doc. 346 (emphasis added).  The second Rule 11 motion, doc. 834, was necessarily directed to the Third Amended Complaint and was likewise denied without prejudice as being premature, and permitted "refiling" after a ruling upon the dispositive motions.  Doc. 869.  The two orders did not contemplate that the Court would "reconsider" those two motions.

When Judge Vinson denied the first Rule 11 motion, he was aware of the tentative factual premise of the suit.  In response to the first motion for Rule 11 sanctions, Plaintiff filed a Rule 11(b)(3) statement.  Doc. 193.  This was a report of the

evidence that Plaintiff had to support the allegations of the complaint at that time, and a plan of discovery.  Plaintiff said that further discovery was needed to determine the role, "if any, each [Provider] played in the firing and incarceration of Plaintiff Yurus."  *Id.*, ¶ 1. Plaintiff asserted that the Providers had a corrupt relationship with the State based upon evidence of campaign contributions and gifts.  *Id.*, ¶ 3.  Plaintiff asserted Hicks Winters said in her deposition that she talked with Providers VALIC and BenefitsCorp, but may have also talked with others, before she decided to fire Plaintiff.  *Id.*, ¶ 6.  Plaintiff asserted that there was a meeting with Providers in which Plaintiff was an "agenda item," and that Plaintiff had not yet been able to discover the extent to which the Providers were involved with the civil commitment of Plaintiff.  *Id.*, ¶ 9-10.  In Plaintiff's response to the first Rule 11 motion, Plaintiff represented that he had the following evidence: (1) that he was listed as an agenda item for the February 17, 2000, meeting of Providers; (2) that Kenneth Fuller of T. Rowe Price assisted Hicks Winters in her response to the investigation of Plaintiff's "whistle-blower" complaint; (3) that state actors had transmitted news articles regarding the arrest of Plaintiff to Providers.  Doc. 210, p. 5.  Plaintiff argued again that T. Rowe Price was under considerable pressure to justify the poor performing investments, but had a significant financial incentive to insist that those investments not be terminated.  *Id.*, pp. 4-6.

A conspiracy may be proved by circumstantial evidence.  Counsel for Plaintiff at this stage was diligently pursuing discovery to see if there was enough circumstantial evidence to support his claims against the Providers.

The Rule 11 motions were denied because they were premature.  A premature Rule 11 motion is an unfounded Rule 11 motion.  Such a motion is unfounded because

greater latitude is permitted under Rule 11 for pleading claims which might pan out in discovery.  Under Rule 11, the frivolity of a pleading is determined at the time the pleading is filed.  A violation of Rule 11 is not determined by *post hac* analysis, even if discovery shows that claims are unfounded.  In contrast, a § 1988 motion judges the status of the evidence when the case ends.  The orders finding the two earlier Rule 11 motions to be premature implicitly concluded that counsel for Plaintiff was entitled to conduct discovery as to the claims made in the Second and Third Amended Complaints, and that there was enough evidence to justify allowing the case to go forward through discovery to summary judgment.

The Court simply permitted Defendants to *refile* the Rule 11 motions after the dispositive motions had been determined.  Whether or not Plaintiff and his counsel were to be found to have violated Rule 11 was to be determined after the dispositive motions had been determined.

BenefitsCorp properly identified the relevant Rule 11 violation by focusing upon Plaintiff's motion for partial summary judgment.[14]  This filing was new.  It was not the subject of the two prior motions.  The analysis above with respect to BenefitsCorp's motion applies equally here.  Thus, T. Rowe Price's Rule 11 motion should partially be granted, and the same liability imposed upon David Yurus and counsel, Steven R. Andrews, as imposed in favor of BenefitsCorp.  No liability exists as to Samantha Yurus

---

[14] It was also violative of Rule 11 to make these same arguments in filing opposition to T. Rowe Price's motion for summary judgment.  Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Associated Contractors, Inc., 877 F.2d at 942.  There is no need to consider this, however, as the expense caused T. Rowe Price was in responding to Plaintiff's motion for partial summary judgment.

as she did not file the motion for partial summary judgment.  In all other respects, the

motion for Rule 11 sanctions should be denied.

### § 1927

This leaves for consideration the § 1927 motion.  Section 1927 provides that:

"Any attorney or other person admitted to conduct cases in any court of the United

States or any Territory thereof who so multiplies the proceedings in any case

unreasonably and vexatiously may be required by the court to satisfy personally the

excess costs, expenses, and attorneys' fees reasonably incurred because of such

conduct."  28 U.S.C. § 1927.  "To justify an award of sanctions pursuant to section

1927, an attorney must engage in unreasonable and vexatious conduct; this conduct

must multiply the proceedings; and the amount of the sanction cannot exceed the costs

occasioned by the objectionable conduct."  Schwartz v. Millon Air, Inc., 341 F.3d 1220,

1225 (11th Cir. 2003) (citations omitted).

> "Bad faith" is the touchstone.  Section 1927 is not about mere negligence.
> A determination of bad faith is warranted where an attorney knowingly or
> recklessly pursues a frivolous claim or engages in litigation tactics that
> needlessly obstruct the litigation of non-frivolous claims.

Id., citations omitted.

It cannot be said that counsel, Steven R. Andrews, acted in bad faith by

"knowingly or recklessly" pursuing a "frivolous claim" or vexatiously multiplying the

proceedings.  Therefore, § 1927 sanctions should not be imposed.

### Further proceedings

If the district judge adopts any portion of this report and recommendation finding

liability under either § 1988 or Rule 11, and after the parties comply with Local Rule

54.1(E), if any dispute as to amount remains, it would be appropriate to remand for a recommendation as to the amount.  The parties should be aware that ability to pay is relevant.  The financial ability of Plaintiff David Yurus is relevant to the amount of an award pursuant to § 1988, and the "conduct and resources of the party to be sanctioned [pursuant to Rule 11] are relevant to the determination of the amount of sanctions to be imposed."  Baker v. Alderman, *supra*, 158 F.3d at 528.  "Sanction orders must not involve amounts that are so large that they seem to fly in the face of common sense, given the financial circumstances of the party being sanctioned."  Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1337 (11th Cir. 2002).

Accordingly, it is **RECOMMENDED** that:

1.  BenefitsCorp's motion to renew its motions for attorney's fees and sanctions, doc. 1003, be **GRANTED**.

2.  Plaintiff's motion to enforce the settlement, doc. 1013, be **DENIED**.

3.  BenefitsCorp's motion for attorney's fees pursuant to 42 U.S.C. § 1988, doc. 934, be **GRANTED** as to Plaintiff David Yurus, and the parties be directed to comply with the procedures set forth in N.D. Fla. R. 54.1(E).

4.  BenefitsCorp's motion for Rule 11 sanctions be **GRANTED** as to Plaintiff David Yurus and his attorney, Steven R. Andrews, with respect to BenefitsCorp's expenses, including attorney's fees, in defending against Plaintiff's motion for partial summary judgment, doc. 737, and the parties be directed to comply with the procedures set forth in N.D. Fla. R. 54.1(E).

5.  T. Rowe Price's motion to renew the motion (doc. 937) for attorneys' fees and expenses, doc. 991, be **GRANTED**.

6.  T. Rowe Price's motion that this Court reconsider the two earlier Rule 11 motions, doc. 937, be **DENIED**.

7.  T. Rowe Price's motion for attorney's fees pursuant to 42 U.S.C. § 1988, doc. 937, be **GRANTED** as to Plaintiff David Yurus for all expenses incurred in defense of this suit, and as to Plaintiff Samantha Yurus for all expenses incurred in defense the claim of loss of consortium,  and the parties be directed to comply with the procedures set forth in N.D. Fla. R. 54.1(E).

8.  T. Rowe Price's motion for fees and costs pursuant to Fed.R.Civ.P. 11, doc. 937, be **GRANTED in part** as to Plaintiff David Yurus and his attorney, Steven R. Andrews, with respect to T. Rowe Price's expenses, including attorney's fees, in defending against Plaintiff's motion for partial summary judgment, doc. 737, and the parties be directed to comply with the procedures set forth in N.D. Fla. R. 54.1(E), but in all other respects, T. Rowe Price's motion for fees and costs pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927, doc. 937, be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on August 15, 2005.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**